THE KEMPER GRAIN COMPANY, *Appellant*, v. ALVIN HARBOUR, Doing Business as the Harbour Grain Company et al., and THE NATIONAL BANK OF COMMERCE OF WICHITA, Interpleader, *Appellees*.

No. 18,229.

### SYLLABUS BY THE COURT.

SALE—*Nonpayment—Resale by Purchaser—Replevin from Subvendees by Original Seller.* In an action by the seller of a quantity of wheat to reclaim it against subvendees, because of the failure of the buyer to pay for it held that a finding against the plaintiff is supported by evidence tending to show the following facts:

The plaintiff acquired title to the wheat while in the hands of the railroad company by paying a draft to which the bill of lading was attached; it then made a bargain for its sale, surrendered the bill of lading to the railroad company, and directed the cars to be set out at the elevator of the buyer; at the same time it drew upon the buyer for the price through a bank in another city, so that two days' time would necessarily pass before the presentation of the draft; the buyer rebilled the wheat and sold it by transfer of the bill of lading.

Appeal from Wyandotte district court, division No. 1. Opinion filed June 7, 1913. Affirmed.

*Ross B. Gilluly*, of Kansas City, Mo., for the appellant.

*R. R. Vermilion, Earle W. Evans*, and *Joseph G. Carey*, all of Wichita, for appellee The National Bank of Commerce.

*W. H. H. Piatt, Thomas R. Marks*, both of Kansas City, Mo., *O. L. Miller*, and *C. A. Miller*, both of Kansas City, for appellees B. C. Christopher & Company *et al.*

### STATEMENT.

The precise contents of the memoranda exchanged by the Kemper Grain Company and Alvin Harbour, doing business as Harbour Grain Company, referred

to in the following opinion, are shown by these copies:.

MEMBER
WICHITA BOARD      HARBOUR GRAIN COMPANY,
   OF TRADE.           209 Board of Trade,
   CODES,              WICHITA, KANSAS.
ROBINSON'S                No. 295.
RIVERSIDE.                                      12/13/1.

*Kemper Grain Co., City:*

GENTLEMEN—This confirms purchase of you to-day by person.
(Johns) of one car 2/60 hard wheat, at 95c per bu., basis Kan-
sas City, subject to sample inspection and our weights, shipment.
at once, via Santa Fe.

Car 23549 AT applies.

To be ordered to our elevator.      HARBOUR GRAIN CO.
      C W                                  J. Alvin Harbour.

Attach memorandum to your drafts
showing your weights.
The Kemper Grain Co.,
103-4 Board of Trade, Kansas City, Mo.;
323 Sedgwick Bldg., Wichita, Kans.;
Coffeyville, Kans.

This contract is subject in all respects to the rules.
and regulations of the Board of Trade of the issuing
office.

WICHITA, KANS., 12/13/10..
*Harbour Grain Co., City:*

We confirm sale to you by sample of one car cap. bushels No.
2 hard 60-pound wheat, at 95 cents f. o. b., Kansas City basis,.
Wichita weights, Wichita grades, spot shipment.    Bill cars:
Car 23549 A. T. ordered to your elevator.

ACCEPTED.

Sign here...............................

It is understood and agreed that this confirmation is a part
of the contract and that if the grain mentioned above is not.
shipped within the specified time, we reserve the right at our
option to cancel, extend time or buy in for sellers' account, and
that this contract is not performed until destination, weights.
and grades mentioned above are obtained.

*Cars to be Loaded to Capacity.*

We urge you to take up with us immediately by wire any
objections to this contract, failing to hear. from you immediately
we will consider the same fully accepted.

THE KEMPER GRAIN CO.
By Johns.

The receipts for bills of lading, to which reference is
made, were in the following form: (The italicised

portion being filled in, the remainder constituting a printed blank.)

Received of *Kemper Grain Co.*
Original Bill of Lading covering shipment described as follows: "Shippers' Order. Notify *Kemper Grain Co.*

Destination, *Wichita, Ks.*

| | | Car No. | | | |
|---|---|---|---|---|---|
| Origin | Date | and Initial | Contents | Weight | Shipper |
| *Lewis, Ks. 12/7/10.* | | *17518 A. T.* | *Wht.* | *55,000* | |

Wichita, Kansas, *12/13/10.*                    Time Ordered *2:00 p. m.*
Set for unloading to                              J. R. Ness, Agent,
     *Harbour Elevator*                          Santa *Fe.* R. R.

By *REJ—12/13/10.*

The opinion of the court was delivered by

MASON, J.: The Kemper Grain Company owned several cars of wheat upon the tracks of the Santa Fe Railway Company at Wichita. It made a bargain with Alvin Harbour, doing business as the Harbour Grain Company, for the sale to him of the wheat. Without having paid for it, Harbour obtained possession, or such color of possession as enabled him to reship it in his own name to his own order, and to procure bills of lading from the railway company. Upon the strength of these bills of lading he sold the wheat to different persons, receiving payment. The Kemper Grain Company, not having been paid, and claiming still to be the owner of the wheat, brought replevin for it while it was physically in the control of the railway company, making the various claimants parties. Upon a trial the court found generally against the plaintiff, and rendered judgment accordingly. The plaintiff appeals.

The transactions with reference to the several cars of wheat were not precisely the same, but the differences were not such as substantially to affect the questions of law involved. For convenience the facts will be stated regarding two cars of wheat claimed by B. C. Christopher & Company, and the discussion will be confined to the controversy with respect to them. These defendants maintain, first, that the deal between

the Kemper company and Harbour amounted to an actual sale of the wheat on credit; that the title passed to Harbour; that he sold to B. C. Christopher & Company, who thereby became the owners; and that Harbour's failure to pay the Kemper company can not affect their rights. As a second proposition they contend that even if there was not a completed sale and passing of title to Harbour from the Kemper company, the Kemper company, in the course of the negotiations for a sale, voluntarily gave Harbour possession of the wheat, intending thereby a complete and unrestricted delivery—not merely for some temporary purpose, as for examination of its quality; that even if a sale for cash were in contemplation, and even if the Kemper company had the right as between itself and Harbour to reclaim the wheat on account of the nonpayment of the price, it can not assert title against the Christophers, who in good faith bought and paid for it, believing and being justified in believing that Harbour owned it.

The trial court made no special findings, and must be deemed to have resolved every conflict of evidence, and every question of the credibility of a witness, against the plaintiff, and to have made every permissible inference in favor of the defendants. Therefore, the first question of law to be determined is this: Is there any evidence to support a finding that the Kemper company sold the wheat to Harbour on credit? We are constrained to answer this in the affirmative. For simplicity in statement we shall at times speak of matters which there is some evidence to support, as though they were established facts. The plaintiff's manager at Wichita testified that he sold the wheat to Harbour, having no special arrangement as to payment different from that in the case of other cars sold to him, the sale being made under the rules of the Wichita board of trade, and the terms cash. Confirmations of the sale

were exchanged, forms of which are given in the preliminary statement. The body of Harbour's confirmation as to one car (the others being substantially the same) read:

"This confirms purchase of you to-day by person (Johns) of one car 2/60 hard wheat, at 95c per bu., basis Kansas City, subject to sample inspection and our weights, shipment at once, via Santa Fe.
Car 23549 AT applies.
To be ordered to our elevator."

The body of the corresponding confirmation by the Kemper company read:

"We confirm sale to you by sample of one car cap. bushels No. 2 hard 60-pound wheat, at 95 cents f. o. b., Kansas City basis, Wichita weights, Wichita grades, spot shipment. Bill cars: Car 23549 A. T. ordered to your elevator."

The precise character of the transaction is not definitely determined by the face of these writings. Such determination may be affected not only by evidence of the meaning of any technical terms used, but especially by the conduct of the parties in relation to delivery and by the provisions made for collecting payment. The actual manner in which business between the Kemper company and Harbour was conducted becomes, therefore, of the greatest importance. The wheat was bought by the Kemper company at a point on the Santa Fe railway near Wichita. The original owner shipped it to his own order at Wichita, and drew upon the Kemper company at Kansas City for his pay, attaching the bill of lading to his draft. The draft was paid and the bill of lading was sent to the company's manager at Wichita. The company therefore had the two cars of wheat upon the track at Wichita, and had the bills of lading as evidence of its ownership. It could, of course, reship the wheat if it desired. Under the rules and practice of the railway company, it had the privilege of having the cars de-

livered without further charge, by means of a belt line, to any one of a considerable number of local industries. But before the Santa Fe railway would set out a car for unloading at any siding on the belt line it required the surrender to it of the bill of lading. In exchange it would give the owner a receipt for the bill of lading, a form of which is shown in the preliminary statement. A copy or duplicate of this receipt would be given to the employees operating the belt line, who would place the car in conformity with the disposition there indicated.

In the present case the Kemper company, having the two cars of wheat thus subject to its control, negotiated the sale to Harbour. It then delivered the bill of lading to the railway company and received a receipt containing the words: "Set for unloading to Harbour Elevator." It attached this receipt to a draft upon Harbour for the price, and in accordance with its custom sent the draft for collection to a Kansas City bank. The draft was sent by the bank to its correspondent at Wichita, and on presentation Harbour failed to pay it. The forwarding of the draft to Kansas City and its return to Wichita had taken up, as usual, about two days' time. In the meanwhile the railway company had delivered the bill of lading and the duplicate receipt to the employees operating the belt line, and they had set out the cars on the siding at the Harbour elevator. Harbour negotiated a sale of the wheat to B. C. Christopher & Company, shipped it to his own order at Kansas City, drew upon Christopher & Company for the price, attaching the bill of lading. The draft was paid, and while matters stood in this situation the Kemper company brought its action.

The plaintiff contends that there was no intentional or valid delivery of the wheat to Harbour; that in the ordinary course of business the car would not have been set out to the Harbour elevator at once, but

would have reached there about the time of the return of the draft from Kansas City; that Harbour had no right to exercise any control over the wheat until he had paid the price and obtained the receipt (for the bill of lading) which was attached to the draft; that with a fraudulent purpose he procured the cars to be placed on his siding at once and wrongfully took possession of the wheat. These contentions involve a number of propositions which we must regard as questions of fact, to be determined by the trial court upon all the evidence.

Did the Kemper company intend a delivery of the wheat to Harbour? While it had the bill of lading in its possession it was absolutely secure. The fact that the railway company required the bill of lading to be delivered up before it would set out the cars at the Harbour elevator, and that the Kemper company acquiesced in this requirement, is some evidence that both parties regarded the direction placed upon the duplicate receipt, to set the cars for unloading at the Harbour elevator, as contemplating an actual delivery. The receipt can not be said as a matter of law to be the equivalent of a bill of lading. The evidence does not conclusively establish that it was so regarded.

Did the Kemper company intend to exact payment of the price as a condition of the passing of the title? It could have made the delivery unquestionably contingent upon payment, and chose not to exercise the power. It could have caused its draft to be presented to Harbour at once, but it voluntarily elected to collect it through Kansas City, thereby necessarily causing a delay of two days. We do not think it can be said, as a matter of law, that a literal cash on delivery payment was intended, or that the evidence conclusively establishes that intention. The trial court had a basis for finding, and must be deemed to have found, that the Kemper company contemplated a delay of payment for two days,

and was content to give credit for that time. This view is strengthened by the fact that for a period of substantially six months Harbour had succeeded in doing business upon the capital of the Kemper company. He would buy wheat from the company, have delivery made at his elevator, and find a buyer, upon whom he would draw for the price with the bill of lading attached. He would then cash the draft and with the proceeds take up the Kemper draft when it arrived at the end of its two days' trip. If the sale by the Kemper company to Harbour was made upon credit, as the court must be deemed to have found upon what we regard as sufficient evidence, the Christopher firm acquired a good title to the wheat, and the debatable questions of law argued on behalf of the plaintiff do not require decision.

If it should be conceded that the Kemper company, while intending an actual delivery of the wheat to Harbour, intended at the same time an immediate payment of the purchase price, or intended that the title should not pass without payment, the question whether it could, by reason of the nonpayment, reclaim the property after it had passed into the hands of an innocent purchaser, is one upon which there is a sharp conflict of judicial opinion. In *Bank v. Brown,* 80 Kan. 520, 103 Pac. 102, 23 L. R. A., n. s., 824, this court went very far in upholding the right of a seller, who intended no extension of credit, to reclaim his property after a considerable interval, where it was held by an attaching creditor of the buyer. If the property had reached an innocent purchaser a very different question would have been presented. The cases bearing on that question are collected in a note in 13 L. R. A., n. s., 697. A typical case supporting the right of the seller to retake his goods, even as against an innocent purchaser, is *National Bank of Commerce v. R. R. Co.,* 44 Minn. 224, 46 N. W. 342, 9 L. R. A. 263, 20 Am. St.

.Rep. 566, where it was held that one who had sold goods for cash, taking a check from the buyer, was entitled, upon the dishonor of the check, to reclaim the goods even from an innocent subvendee for value. In the note referred to it is said:

·    "While the Massachusetts court has gone as far, perhaps, as any of the courts in protecting the original vendor, yet that court will refuse to extend its protection to him where it appears that he makes an unconditional delivery of the property to the vendee. Thus, in *Goodwin v. Boston & L. R. Co.*, 111 Mass. 487, the vendor of a large quantity of grain sold without any special agreement as to payment caused the delivery of the same to be made to the buyer by giving an order to him on the warehouse for the amount sold. It appears that it was the usage of the grain trade, under which this grain was sold, to consider a sale such as the one mentioned a cash sale, and to give to the buyer an order for delivery before payment was made, and to allow him not exceeding ten days before calling on him for payment. Before the expiration of the ten days the buyer had transferred the property to a third person under replevin of the original vendor. It was held that he had waived the right to insist upon payment as a condition precedent to the passing of title, the court saying: 'Upon such contracts the seller is not bound to deliver without payment of the price at the same time. But, if he does make an unqualified delivery, he waives his advantage, and the title passes, and his lien for the price is discharged.' "    (13 L. R. A., n. s., 697.)

A valuable discussion of the question is found in a ·  recent textbook, the author's conclusions, with the reasoning upon which they are based, being shown by these excerpts, the portions thought to be especially to the purpose being italicised:

"Whether a sale is complete with a lien retained by the seller, or whether the property has not passed, and will not pass until the buyer pays the price, is a question that has some importance when merely the rights of the buyer and the seller are concerned. . . . The greatest importance of the question arises, however, when the rights of third persons are concerned. If

Grain Co. v. Harbour.

the property does not pass till payment, a purchaser from the buyer gets no title. . . . The cases which present difficulty are where the seller has voluntarily parted with possession and for a purpose other than the temporary one of examination or the like. *It is universally admitted in the decisions that delivery is at least evidence of a waiver, but it is also generally said that it is only evidence, and that the seller's intent not to waive the benefit of his condition may be shown.* An analysis of the situation upon principle makes it evident that the real question is, Does the seller assent to the transfer of the property?—and in order to answer this question the original bargain and what is subsequently done must both be considered. If the original bargain was for a cash sale, that must mean that the buyer was to have neither the title nor the use and enjoyment of the goods until the price was paid. If the buyer was to have the use and enjoyment of the property, though not the title, before payment of the price, the transaction is a conditional sale, not a cash sale. Accordingly, if after bargaining for a cash sale the seller subsequently voluntarily delivers to the buyer the goods with the intent that the buyer may immediately use them as his own, and without insisting upon contemporaneous payment, this action is absolutely inconsistent with the original bargain. *Such a delivery is not only evidence of the waiver of the condition of cash payment, it should be conclusive evidence.* . . . Sometimes after a bargain for a cash sale the buyer gives in payment of the price a worthless check, and it has been held that such a false check is no payment; and that not only does no title pass to the fraudulent buyer, but that the seller may assert his title against an innocent purchaser from the buyer. It is submitted that such decisions are unsound. The reasoning upon which they rest is that a worthless check is no payment of the price, and the condition has not happened upon which the property was to pass. But the real question is, Did the seller assent to transfer the ownership in the goods; and it can hardly be doubted that he did. If a seller should say 'you must not deal with these goods, though I have put them in your hands, until I collect the check,' that would show an intent not to transfer the property to the buyer. *But where the goods are put into the*

*buyer's hands without more, it can hardly be doubted that the seller means to allow him to deal with them as his own; to resell them immediately if he feels inclined.* It is true that this assent to the transfer of the property to the buyer has been procured by fraud; therefore, the seller may reclaim the goods from the fraudulent buyer. But, as in other cases where the seller is induced to part with his property by fraud, the voidable title of the fraudulent buyer becomes an indefeasible title upon a *bona fide* purchaser from the fraudulent buyer. The matter may be thus summarized: If the goods are delivered without any permission, express or implied, to the buyer to deal with them as his own until the price is paid, the condition that payment shall be simultaneous with the transfer of title is not waived; but if the seller on delivering the goods does so without restriction, so that the buyer is violating the terms of no bargain if he uses the goods as his own, it is a conclusion of law that the transaction is not properly a cash sale. At most, it is what has been commonly called a conditional sale; and the natural inference is that the transaction is not even a conditional sale. *A delivery to the buyer with authority to use the goods immediately should be conclusive evidence of transfer of the property in the absence of pretty clear evidence showing an intention to reserve the title.* (Williston on Sales, § 346.)

The conclusion of the trial court not only finds support in the evidence—it accords with the principle that when one of two persons, equally entitled to consideration so far as their purposes are concerned, must suffer from the delinquency of a third, the loss more properly falls upon him who having readily at hand the means of protection has failed to avail himself of them.

It is argued that some of the provisions of the memoranda confirming the bargain between the Kemper company and Harbour, regarding inspection and weights, require a finding that title did not pass. We think, however, these provisions are not conclusive, but merely matters to be taken into account in determining the real intentions of the parties.

The contention is made that the defendants were

Phillips v. Interurban Railway Co.

not innocent purchasers from Harbour, but had knowledge of facts which by imposing upon them a duty of inquiry charged them at least with constructive notice of the plaintiff's rights. This question also was one fairly to be determined by the court under all the evidence.

As already stated, the issues between the plaintiff and the other defendants are controlled by the same considerations. Various phases of the evidence favorable to the plaintiff have not been touched upon because the question before us is not whether the court might have found in its favor, but whether there was any evidence warranting a contrary finding.

The judgment is affirmed.

SYLLABUS BY THE COURT.