724

No. 28,336.

A. B. KIRKPATRICK, *Appellee*, v. THE CHRYSLER SALES
CORPORATION, *Appellant*.

(275 Pac. 155.)

Opinion filed March 9, 1929.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt, Virgil V. Scholes*, all of
Topeka, *H. C. Bulkley, Henry Ledyard* and *Harold R. Smith*, all of Detroit,
Mich., for the appellant.

*Randal C. Harvey*, of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff, A. B. Kirkpatrick, brought this ac-
tion against the Chrysler Sales Corporation, defendant, for a sum of

money alleged to be due him in consequence of the winding up of a business relationship which had theretofore existed between them.

It appears that for several years immediately prior to June 30, 1926, plaintiff had been a dealer in automobiles and automobile supplies in Topeka. In 1918 he had the agency for the sale and distribution of the Maxwell Motor Company's automobiles and repairs for such vehicles. His relationship to that company was defined by a written contract which by its literal terms was to endure for a year. By that contract plaintiff was required to deposit with the Maxwell Motor Sales Corporation a sum of money as a guaranty of the payment of his repair parts account and to avoid the necessity of C. O. D. shipments, and to reimburse the company for any expenditures made by it in protecting the plaintiff's rights as distributor. The net balance of such deposit was to be returned to the plaintiff at the expiration of the annual contract. The contract also provided:

"At the termination of this agreement the company agrees to repurchase from the direct dealer F. O. B. its factory, all new repair parts in good condition purchased by the direct dealer from the company under this agreement which the direct dealer may have in stock at that time at current prices to direct dealers; the direct dealer to return said parts within thirty days from cancellation."

However, as this annual contract was renewed in 1919 and again in 1920 and 1921, plaintiff's deposit was not thus returned, but was transferred to his credit from year to year on the books of the company. Similarly plaintiff's stock of repair parts was not annually shipped back to the factory and credit given therefor as provided by the literal terms of the contract, but was kept on hand as current supplies for the more efficient discharge of his duties as distributor.

In 1922 the Chalmers Motor Car Company took over the business of the Maxwell company, and made a contract with plaintiff substantially similar to the one which had defined his relationship to the Maxwell company. By its terms plaintiff was to be supplied with repair parts for both Maxwell and Chalmers automobiles, and his deposit with the Maxwell company was transferred to the Chalmers company and increased from time to time as his business in the sale of repair parts for these cars increased. His annual contract with the Chalmers company was renewed in 1923.

By these successive contracts both the Maxwell and Chalmers companies had and exercised the right to declare certain repair parts

obsolete and the plaintiff had and exercised the right to return to the companies such obsolete parts as he had not disposed of.

In 1924 the Chrysler Sales Corporation took over the business of the Chalmers company and made a contract with plaintiff whereby he was to serve as distributor of its cars and repair parts on terms somewhat similar to those which had theretofore defined his relationship to the Maxwell and Chalmers companies. By its terms plaintiff was required to handle repair parts for Maxwell, Chalmers and Chrysler automobiles, and his deposit with the Chalmers company was transferred to the Chrysler Sales Corporation. In 1925 the latter contract was renewed for the year terminating on June 30, 1926.

On June 7, 1926, the defendant company notified plaintiff that their contract with him would not be renewed. Plaintiff called defendant's attention to matters which such severance of their business relationship would bring up for disposition—his recent contribution to an advertising campaign set on foot by the defendant, and the large stock of repair parts he had on hand. His letter concluded:

"Do you expect to leave them on my hands? . . . I do not know what rights I may have, but before finding out I would like to know your attitude on these matters."

Defendant replied, citing a clause in the contract touching the rights of the parties with respect to the repair parts, but adding:

"You are well acquainted with our policy regarding our method of giving credits for returned parts. . . . It has been our experience that if the retiring distributor or dealer takes a reasonable attitude, the succeeding organization is usually quite willing to negotiate on an equitable basis with everybody concerned. I am referring your letter to our Mr. Spencer, of Kansas City, and he will be glad to talk with you on anything you may care to bring up in connection with the matter at hand."

The last annual contract executed between plaintiff and defendant, dated July 1, 1925, contained the following:

"(12) The distributor shall sell as repair parts for Chrysler, Maxwell and Chalmers motor vehicles only such parts as are purchased from or have written approval of the company. He shall sell repair parts for Chrysler, Maxwell and Chalmers motor vehicles to consumers at not in excess of the regular list prices published by the company and shall make no charges for government tax, transportation, packing and handling.

"(13) At the termination of this agreement by cancellation by the company

or the refusal of the company to renew this agreement upon its expiration, the company agrees to repurchase at such prices as distributor has paid for same, including any cash discount, from the distributor F. O. B. the company's factory, all new current repair parts in good condition purchased by the distributor from the company under this agreement, which the distributor may have in stock at that time; the distributor to return such parts within thirty (30) days from such termination and to prepay transportation to the company's factory, provided that the company reserves the right to declare obsolete all or any parts for any model and to refuse to buy back or give credit for such parts so obsoleted; it being understood and agreed that the distributor will be given ninety (90) days within which to return such parts for credit after receipt of a notice from the company of their being made obsolete, and mailing of notification by the company of intention to obsolete to the last known address of the distributor shall constitute notice under the terms of this agreement. It is further agreed that the company reserves the right at its option to repurchase new current parts at prices paid by the distributor for same if this agreement is terminated by cancellation by the distributor, or if the distributor fails to renew it upon its expiration.

"(17) The company shall not be liable to the distributor for any loss or damage to motor vehicles or parts under this agreement while the same are in the custody or possession of any railroad, express company, or other common carrier in transit, but all such loss or damage, after such motor vehicles or parts are delivered to such carrier, shall be borne by the distributor, the company being ready to lend the distributor its assistance in the collection of any claim the distributor may have.

"(28) This agreement, when executed, supersedes and annuls all former agreements between the parties, their predecessors and assigns, relative to the sale of Chrysler motor vehicles and repair parts, and all orders or schedules outstanding at that time shall be covered by the initial order hereunder."

Considerable correspondence pertaining to the taking over of plaintiff's stock of repair parts of Maxwell, Chalmers and Chrysler automobiles passed between the parties, which was not concluded within the thirty days next succeeding the termination of the contract. On August 2 defendant wrote:

"Acknowledging your wire of July 31, with reference to disposition of parts of stock.

"Just at this time Mr. Spencer is out of the city and until his return it will be impossible to advise you just what action to take regarding this parts stock.

"However, you may rest assured that upon his return to the office, we will be very glad to bring this matter to his attention, and will advise you further."

Nothing came of this correspondence, and on August 12, 1926, plaintiff shipped to defendant's factory at Dayton, Ohio, 72 packages of repair parts, for which defendant paid certain sums on account, but declined to pay for some 1,200 to 1,500 items on the

alleged ground that they were obsolete and not such as defendant was bound to accept and pay for under its last annual contract.

Hence this lawsuit.

Issues were joined, the contract exhibited, witnesses testified or deposed, catalogues and price lists and correspondence were introduced, and the court sitting without a jury heard the parties at length as upon an accounting. The parties agreed that the court need not make special findings on all the issues, but it did make a number of findings to the effect that plaintiff was entitled to reimbursement for various scheduled lists of returned parts, viz.:

*Exhibit B.* List of returned parts for which defendant issued credit memoranda but refused credit................................... $557.44

*Exhibit D.* List of returned parts for which neither memoranda nor credits were given.............................................. 246.83

*Exhibit F.* List of parts for which credits were given at wrong prices. Balance due thereon......................................... 386.49

Credit due plaintiff for contribution to defendant's advertising campaign ...................................................... 42.78

Total ................................................... $1,233.54
Less item of excess credit allowed by defendant.................... 9.39

Net balance due plaintiff [with interest]...................... $1,224.15

Judgment was entered accordingly, and defendant appeals. It opens its argument by stressing the terms of its last annual contract with plaintiff which expired June 30, 1926. It insists that plaintiff's rights were exclusively governed by the literal terms of that instrument. Sometimes, however, it happens that the practical construction placed on a contract by the parties thereto is more important than its literal terms. In *District of Columbia v. Gallaher,* 124 U. S. 505, 31 L. Ed. 526, it was held:

"When, in the performance of a written contract, both parties put a practical construction upon it which is at variance with its literal meaning, that construction will prevail over the language of the contract." (Headnote.)

In this case it is not possible to reach either a legal or an equitable determination of the rights and liabilities of the litigants without giving cognizance to the methods by which for several years their business dealings were conducted by plaintiff on the one hand and defendant and its predecessors on the other. By the terms of successive annual contracts plaintiff was required to handle repair parts for the Maxwell and Chalmers cars as well as for the

later Chrysler cars. By the operative construction of these contracts plaintiff was neither required nor expected to return to the factory his stock of repair parts at the end of each annual contract. True, each contract so provided, but it was not done, and this customary annual departure from its literal terms was sanctioned. Indeed, it is not too much to infer that the annual return of the balance of repair parts plaintiff had on hand to whichever of these three companies was functioning at the time and their immediate reshipment to plaintiff with each successive renewal of the contract and the needless and wasteful expense incident thereto, would not have been tolerated by either party. So, too, the annual transfer of plaintiff's deposit on the books of the company instead of its surrender and redeposit was another departure from the literal terms of the several contracts by which the operative interpretation of the contract is revealed.

In the analogous case of *Berg v. Scully*, 120 Kan. 637, 243 Pac. 119, one Scully acquired a large acreage of Marion county land when the country thereabout was new. When the country filled up so that land could be rented, Scully leased his lands on annual contracts, requiring each tenant to furnish his own improvements, with the privilege of removing them at the expiration of his tenancy. In actual practice, by successive renewals of such leases, these "annual" tenancies frequently endured for many years and the tenants built substantial houses, barns and fences, and dug wells and planted orchards on Scully's lands, all of which improvements by the literal terms of his contract each tenant had a right to remove at the end of the current year specified in his lease—provided he exercised that right promptly, otherwise not. In actual practice, the right of the outgoing tenant to sell his improvements to the incoming tenant was recognized by Scully, who made the purchase of the outgoing tenant's improvements at a fair price one of the conditions upon which he would lease the premises to any incoming tenant. Berg, a tenant, fell under the weight of Scully's displeasure, and was given notice to quit and promptly evicted at the end of his "annual" term. Scully would not coöperate with him in choosing an incoming tenant who would buy Berg's house, barn, shed, granary, henhouse, tool house, windmill and fences, so of course Berg could not sell them; and obviously his literal right to remove his improvements was worthless, so he apparently stood to lose them to his landlord, *a la* the Irish system of farm tenancy of inglorious memory. But

this court held that the operative construction given to the successive annual leases and the landlord's practical method of dealing with his outgoing and incoming tenants had to be taken into consideration regardless of the literalism of the contract, and under this sound and well-established rule of law a measure of equitable relief was granted to the evicted tenant. Other cases where the operative interpretation of contracts was given controlling significance were: *News Service v. Printing Co.*, 103 Kan. 402, 173 Pac. 980; *Merkle v. Hiatt*, 103 Kan. 767, 770, 176 Pac. 655; *Landon v. Rly. Co.*, 113 Kan. 628, 216 Pac. 309; *Fontana v. Integrity Mutual Casualty Co.*, 120 Kan. 406, 410, 243 Pac. 1036; *Mitau v. Roddan*, 149 Cal. 1, 6 L. R. A., n. s., 275, 281; *Lowrey v. Hawaii*, 206 U. S. 206, 51 L. Ed. 1026, 1033. See, also, 13 C. J. 542, 546; 6 R. C. L. 849, 853.

And so here. That the rights and liabilities of those litigants were not altogether and exclusively defined by the literal terms of the contract July 1, 1925, and ending June 30, 1926, was clearly revealed by the constant and unequivocal recognition of the continuity of the business relationship existing between plaintiff and the Maxwell, Chalmers and Chrysler companies from 1918 to 1926 regardless of successive changes in their corporate control. Indeed, the whole tenor of defendant's correspondence with plaintiff is couched in recognition of the practically undisturbed continuity of this business relationship of the parties over a number of years. On occasion plaintiff was given confidential instructions touching the business of all three companies by a communication entitled *"Maxwell-Chrysler-Chalmers Confidential Bulletin,"* and the price lists of repair parts furnished by this defendant contained lists and prices of Maxwell and Chalmers repair parts as well as those of Chrysler automobiles, and defendant dictated the conditions under which plaintiff was to handle them. Plaintiff could not have rendered efficient service to defendant as distributor of Maxwell, Chalmers and Chrysler repairs without keeping a stock of these on hand, and it is perfectly clear that as long as defendant continued to renew his annual contract the return of such parts at the close of each year would not have been tolerated. Moreover, as in the earlier contracts there was an express provision of the last annual contract whereby a 90 days' notice of obsolescence was to be given during which period plaintiff had the right to return repairs falling under such classification and receive reimbursement therefor. None

of the exhibited lists outlined above were ever subjected to such notice. Defendant says the intimation of obsolescence given to many of these so-called obsolete repairs in its catalogues and price lists was sufficient notice to relieve it of its duty to reimburse plaintiff therefor. We think not. Those price lists were neither intended nor fitted to perform the function of a 90 days' notice of obsolescence. In giving the price lists of obsolete parts there was a statement that such parts were not returnable for credit. Of course that provision was perfectly fair. If plaintiff ordered a repair part according to that schedule he knew he could not return it and get reimbursement therefor. But that provision did not govern his rights touching repairs already bought and paid for by him before such qualified listing appeared in the catalogue. As to all such as he already had on hand he could confidently keep them until sold by him or until he had a 90 days' formal notice of obsolescence, during which time he might return them for credit. It is not contended that any of the items listed in the exhibited schedules B, D or F, outlined above, were bought by plaintiff from defendant or its predecessors at times when they were noted in the catalogues or price lists as not returnable for credit.

Complaint is made that the trial court allowed exorbitant prices for some of the returned parts. But it is not contended that the court allowed any more for them than plaintiff paid for them, and consequently this criticized allowance for reimbursement will have to stand.

Error is also urged upon the fixing of liability on defendant for all the parts returned whether plaintiff was entitled to reimbursement therefor or not, on the mere ground that defendant did not return them to plaintiff. Defendant invokes the rule of law that one to whom unsatisfactory goods have been sent is not obliged to return them in order to avoid liability therefor, but may simply hold them subject to the order of the seller. (24 R. C. L. 435.) But the evidence shows that defendant did not stand on this right of a consignee to whom unsatisfactory goods are sent. It exercised such a dominion over them as to preclude it from claiming that it held them subject to plaintiff's orders. It retained them for a time and eventually shipped them back to Kansas consigned to its own attorneys, in whose custody, so far as the record shows, they still remain. Under such circumstances defendant was not entitled to invoke the rule governing a consignee's right to hold unsatisfactory

goods subject to the order of the vendor. (*Dougherty v. Implement Co.*, 75 Kan. 450, 89 Pac. 900.) See, also, *Peabody School Furniture Co. v. Steel Fixture Mfg. Co.*, 125 Kan. 278, 264 Pac. 27; and 35 Cyc. 258, 262.

It is also contended that the trial court erred in allowing list prices for all the returned parts; that if liable at all defendant was only liable for their reasonable value, which was merely their value as junk at 1¼ cents per pound. This point is untenable. Plaintiff bought all those parts from defendant and its predecessors at list prices, and he was entitled to reimbursement at those prices when their business relationship was severed, seeing that no 90 days' notice of obsolescence of any of the parts it was adjudged to pay for in this lawsuit had been given by defendant or by the earlier companies to whose business it had succeeded.

The other matters urged against the judgment have been patiently considered, but they suggest nothing to warrant further discussion. No palpable error inheres in the judgment which would permit it to be disturbed. It is therefore affirmed.

HARVEY, J., not sitting.