## WINTER et al. v. MILLER et al.
## No. 4040.

United States Court of Appeals
Tenth Circuit.

June 26, 1950.

W. D. Jochems, Wichita, Kan. (Robert G. Braden, Wichita, Kan., was with him on the brief) for appellants.

Howard T. Fleeson, Wichita, Kan. (Homer V. Gooing, Wayne Coulson, and Paul R. Kitch, all of Wichita, Kan., were with him on the brief), for appellees.

Before HUXMAN, MURRAH, and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

The appellees, a copartnership, brought this action in replevin against appellants and E. A. Stephenson in the United States District Court for the District of Kansas to recover 55 head of cattle sold to E. A. Stephenson. At the conclusion of all of the evidence, both parties moved for an instructed verdict. The motion of the defendants was overruled and that of plaintiffs was sustained. Judgment was entered for the plaintiffs upon the instructed verdict and this appeal followed.

Appellees took the position in the court below, as they do here, that the sale was a cash sale, and that title did not pass until the cattle were paid for, and that since Stephenson failed to pay for the cattle, he acquired no title thereto which he could pass on to appellants.

The trial court concluded that the evidence conclusively supported this theory and that there was no issue of fact for the jury's consideration. There is no conflict in the evidence as to the basic facts of the transaction and the only question is whether the court erred in concluding that there was no jury issue in the case.

Earl F. Carr, an agent of appellants, was engaged in buying and selling cattle for them. In such capacity he acquired 55 head of cattle in Arizona in April, 1947. He telephoned Stephenson, the operator of a sales ring at Bucklin, Kansas, and arranged with him to sell the cattle through his sales ring at Bucklin. The cattle were shipped to Bucklin, Kansas. Carr imposed no condition with respect to withholding title but trusted Stephenson to remit the proceeds of the sale. About ten days after shipment, Carr telephoned from California inquiring about the cattle. Stephenson informed him that he had placed the cattle in a pasture to condition them after the rigors of transit. Carr approved of this. About a week later, Carr called again and was informed that the cattle had not been sold due to lack of attendance caused by heavy rains and bad road conditions. On April 21, 1947, Stephenson mortgaged the cattle to appellants to secure a pre-existing indebtedness. On April 28, Stephenson wired Carr, "How much on the

55 head to you." Carr called Stephenson and said he wanted to sell the cows and would take $95 per head. Stephenson said that he would buy them himself, to which Carr agreed. Stephenson said he would send a check but Carr preferred to draw a draft for the cattle. Carr notified his office of the sale and requested that a draft be drawn. Carr knew that from one to four days would be taken after notification for the preparation of the draft. A draft was drawn on the Bucklin State Bank. The invoice was prepared May 8, but was dated back to April 9, and was headed, "Sold to E. A. Stephenson, Bucklin, Kansas." No title reservation was placed in the invoice, nor was reservation of title ever mentioned. About May 12, the draft was dishonored. In a subsequent telephone conversation, Carr was told by Stephenson that there must have been a mix-up at the bank and was informed that a check would be mailed immediately. This was done and the check likewise was returned for non-payment on May 27. After the return of the check, Carr again called Stephenson and was told that there was another mix-up at the bank. Carr informed Stephenson that he would require a bank guarantee of the check. Carr called the bank on the following day and was informed that no such guarantee was made or arranged for. Up to this time, Carr had the utmost confidence in Stephenson. Carr assured his employers that the money would "sure come through, that it was absolutely as good as gold."

On May 21, Stephenson sold these and other cattle to appellants and was credited on their books on his indebtedness to them in the sum of $50,000. During all this time these cattle were kept with others in a pasture rented by Stephenson. About June 9, Carr arrived at Bucklin to look after the account. When he saw Stephenson, he first asked him for his money and was told that Stephenson was getting a loan from Kansas City and that it had not yet gone through. Carr gave Stephenson the rest of the day to contact Kansas City,

and the next day the two drove to Dodge City to try and contact Kansas City from there. When these efforts failed, they went back to Bucklin and Carr allowed Stephenson that night to contact the Kansas City parties. Carr testified that he told Stephenson that he "came back here and I want to get this straightened up and I want my money for these cattle so I will take the cattle and sell them." They then arranged for trucks to take the cattle to Dodge City to sell them. It was agreed that if the cattle brought more than $95 per head Stephenson was to get the overage. While they were loading the cattle, appellants arrived at the pasture. The parties were unable to agree as to the ownership of the cattle and this litigation ensued.

■■■ Strictly defined, a cash sale is one in which the title to the property and the consideration pass simultaneously. So defined, title remains in the vendor until the purchase price is paid. However, in business transactions, the term is not ordinarily used so narrowly. Williston in his work on sales, Sec. 342-3, states the modern rule as follows: "Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed." Williston states that this rule is contrary to the old rule, according to which title to property was presumed not to pass without payment or credit or delivery.

■■■ In determining whether title passes from the seller to the buyer in a sales transaction, the guiding factor is the intention of the parties,[1] In seeking to determine the intent of the parties, the operative construction placed thereon by them is entitled to great weight. Kansas has held that the precise character of the transaction is not definitely determined by the writings of the parties and that sometimes a practical construction placed on the contract by

1. Kennedy v. Glen Cove Mutual Ins. Co., 154 Kan. 327, 118 P.2d 591; Kingman v. Holmquist, 36 Kan. 735, 14 P. 168, 59 Am.Rep. 604; Stewart v. Henningsen Produce Co., 88 Kan. 521, 129 P. 181, 50 L.R.A.,N.S., 111, Ann.Cas.1914B, 701.

the parties thereto is more important than its literal terms, and that when by the performance of a written contract both parties put a practical construction upon it at variance with its literal meaning, such construction will prevail over the language of the contract.[2]

There is much in the record, we think, tending to support a finding that this was an ordinary sale of cattle without thought, intent, or express understanding that title should remain in the vendor until the purchase price was received. It is of significance that in none of the negotiations between Carr and Stephenson, resulting in the sale of the cattle to Stephenson, was the term "cash" or "cash sale" used by Carr. When Carr priced the cattle at $95 per head, Stephenson said, "I will buy them myself." Carr agreed and prepared an invoice stating that the cattle had been "Sold to E. A. Stephenson." There was no suggestion that title was to remain in the vendor until payment was received. Carr merely inquired how Stephenson wanted to pay for the cattle and when Stephenson replied, "By check," Carr suggested a draft. When the draft was dishonored, Carr agreed to payment by check. During all this time Carr apparently treated the transaction as constituting an outstanding account. Thus, in a conference with his employers after the draft and the check were returned, he assured them that the money would "sure come through, that it was as good as gold." Also, after Stephenson had failed to obtain a bank guarantee of his check, Carr began to make inquiry of some Kansas friends, because, "This is the first time when this happened that it began to dawn on me that possibly Stephenson's account was no good."

After all this intervened, he finally came to Kansas, not primarily to repossess his employer's property but to collect the account. It was only after all efforts to collect the account had failed that he and Stephenson arranged to sell the cattle. Even then he agreed that Stephenson should have any overage above $95 per head resulting from the sale.

██ It has also been held that where title does not pass until payment, but possession passes, and payment is refused, the right to repossess must be exercised promptly,[3] or it may be waived.[4] The nature of the transaction, together with the subsequent conduct of the parties, are susceptible of different constructions. The facts of the case and the inference deducible therefrom would, in our opinion, support a finding if made by the jury that there was no reservation of title until payment was actually received.

Under somewhat similar facts, the Kansas court in Kemper Grain Co. v. Harbour, 89 Kan. 824, 133 P. 565, 567, 47 L.R.A.,N.S., 173, held that it could not be said "as a matter of law, that a literal cash on delivery payment was intended, or that the evidence conclusively establishes that intention."

The case of Dosbaugh National Bank v. Jelf, 86 Kan. 41, 119 P. 538, upon which appellees place strong reliance, is distinguishable upon the facts. We think there was present a disputed issue of fact and that the case should have been submitted to the jury.

Reversed and remanded.

2. Kemper Grain Co. v. Harbour, 89 Kan. 824, 133 P. 565, 47 L.R.A.,N.S., 173; Kirkpatrick v. Chrysler Sales Corp., 127 Kan. 724, 275 P. 155; Clarkson v. Frigidmist, Inc., 168 Kan. 197, 212 P.2d 214.

3. Daugherty v. Fowler, 44 Kan. 628, 25 P. 40, 10 L.R.A. 314; People's State Bank of Michigan Valley v. Brown, 80 Kan. 520, 103 P. 102, 23 L.R.A.,N.S., 824.
4. 46 Am.Jur., Par. 448, Page 613.