**ANDERSON–THOMPSON, Inc.,**
**Appellant,**

v.

**LOGAN GRAIN COMPANY,**
**Appellee.**

**No. 5343.**

United States Court of Appeals
Tenth Circuit.

Oct. 22, 1956.

Rehearing Denied Nov. 16, 1956.

Charles H. Haines, Jr., Denver, Colo. (Grant, Shafroth & Toll, Denver, Colo., Ham, Johnson & Shinn and Harlan Johnson, Lamar, Colo., on the brief), for appellant.

Alfred P. Davis and James L. Tilly, Denver, Colo. (Tilly & Skelton, Denver, Colo., and William Stowell, Phillipsburg, Kan., on the brief), for appellee.

Before BRATTON, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

PHILLIPS, Circuit Judge.

On June 28, 1954, Logan Grain Company [1] brought this action against Anderson-Thompson, Inc. [2] to recover $2,687.50, the balance due on a contract of sale of 500 bags of sumac seed and $318.75 for storage charges, on account of the failure and refusal of the buyer to receive delivery of 250 bags of such seed.

Thereafter, on October 25, 1955, the seller filed a supplemental complaint in which it alleged the same facts averred in its original complaint and further alleged that subsequent to the filing of the original complaint the 250 undelivered bags of seed lost their germination quality and value for seed and that the seller sold them for $2.42 per cwt.

In its answer to the supplemental complaint the buyer alleged that it was the duty of the seller to mitigate the damages and sell the rejected seed within a reasonable time after the refusal and that the market value of the undelivered 250 bags of sumac seed was not less than $9 per cwt. at a time when the seller had reasonable opportunity to mitigate the damages by selling the undelivered seed.

The buyer further alleged that the amount involved was less than $3,000 and that the court did not have jurisdiction of the action.

The trial court awarded judgment to the seller for the difference between the balance due on the contract price of $2,687.50 and the $605 received by the seller from the sale of the seed; that is, $2,082.50, with interest thereon from June 28, 1954. The buyer has appealed.

On March 13, 1953, Tallif R. Henrickson, the managing partner of the seller, in a long distance telephone conversation with Elbert Anderson, secretary of the buyer, offered to sell the buyer 500 bags of sumac seed at a price of $10.75 per cwt., f.o.b. shipping point, the seed to have a purity of 98 per cent and a germination quality of 85 per cent or better. The buyer accepted the offer and agreed to purchase the seed. The buyer was to receive the seed in truck loads of 250 bags each. The buyer and seller agreed that one load was ready for delivery and the balance would be ready in a few days. On March 13, 1953, the seller had available at its warehouse at Logan, Kansas, 250 bags of sumac seed of 98 per cent purity and 85 per cent germination quality, packed in burlap bags, ready for delivery.

The parties agreed that the buyer would send a written confirmation of sale. Under date of March 13, 1953, the buyer sent a written confirmation of the sale of 500 bags of sumac seed of 98 per cent purity and 85 per cent germination quality, packed in 100 pound bags at $10.75 per cwt. A short time after receipt of the written confirmation the seller had set aside in its warehouse at Logan, Kansas, 500 bags of sumac seed in a deliverable condition, of the quality and kind agreed to in the contract of sale of March 13, 1953, and the seller kept the 500 bags of seed in its warehouse at Logan, Kan-

---

1. Hereinafter called the seller.

2. Hereinafter called the buyer.

sas, until the buyer and seller mutually agreed in a telephone conversation of April 7, 1953, that the buyer would pick up 250 bags of the seed at Osborne, Kansas. On April 7, 1953, the buyer agreed with the seller in a telephone conversation to pick up 250 bags of seed at Osborne within 10 days and to pick up the balance of the seed at the seller's warehouse at Logan, Kansas, shortly thereafter. On April 21, 1953, the buyer had not yet picked up the first load of seed. In a telephone conversation on that date, Anderson again agreed with Henrickson to pick up the seed in a few days. On May 7, 1953, the buyer had not yet picked up any of the seed. In a telephone conversation on that date, Anderson again agreed with Henrickson to pick up the seed within a very few days. Thereafter, in May, 1953, the buyer picked up 250 bags of seed at Osborne, Kansas. On April 7, 1953, the seller had set off, separate and apart, in a deliverable condition, the remaining 250 bags of seed at its warehouse in Logan, Kansas, for the account of the buyer.

On May 26, 1953, the seller drew a sight draft on the buyer for $5,375, the purchase price of the seed. The draft was sent by the First National Bank of Logan, Kansas, to the First National Bank, Lamar, Colorado. The buyer dishonored the draft.

On May 27, 1953, the buyer forwarded its check to the seller for $2,687.50, enclosed with a letter in which the buyer said, "Please find enclosed our check for the load of seed. I guess we will not be able to use any more, so you can just cancel it." The letter and check were received on June 1, 1953. Thereafter, on that day, Henrickson called Anderson and asked him why the buyer had dishonored the draft and stated that the seller was holding the balance of the seed for the buyer's account and endeavored to get the buyer either to pay for or pick up the balance of the seed.

In that conversation Henrickson offered to sell the seed for the buyer's account and stated he believed he could obtain $8 per cwt. The buyer refused to agree to such sale. The buyer promised Henrickson that it would thereafter advise him what it would do with respect to the balance of the seed.

The seller received no further word with respect to the seed from the buyer. The seller kept the remaining 250 bags of sumac seed, in a deliverable condition, set off separately for the buyer, in its warehouse at Logan, Kansas, until August 1, 1954, when it sold the seed for $605.

From time to time after June 1, 1953, the seller tested the germination quality of the seed. In the fall of 1953, a test showed a germination quality of 78 to 80 per cent. In the spring of 1954, a test showed a germination quality satisfactory for seed purposes in some states, but not up to 85 per cent. In the latter part of July, 1954, two tests showed the germination quality below 60 per cent and no longer suitable for seed. Thereupon, the seller sold the seed on August 1, 1954, for $605.

The wholesale market for sumac seed opens up in the fall of the year, in November or December, and runs until about the middle of May. After the wholesale season, there is a retail season, depending upon weather conditions, which may continue until about the middle of June.

At the time of the commencement of the action, on June 28, 1954, the amount in controversy, exclusive of interest and costs, exceeded $3,000.

In the absence of bad faith or collusion, not here present, jurisdiction attaches at the moment of the filing of the complaint and the existence of a good defense or a voluntary or involuntary reduction of the amount claimed, or a change in the cause of action, will not defeat jurisdiction previously acquired.[3]

3. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845; Ford, Bacon & Davis v. Volentine, 5 Cir., 64 F.2d 800; Grant County Deposit Bank v. McCampbell, 6 Cir., 194 F.2d 469, 31 A.L.R.2d 909;

■ It is clear that at the time of the filing of the complaint, which was an action for the balance of the purchase price and storage charges, the amount in controversy, exclusive of interest and costs, exceeded $3,000. The event which changed the amount of the claim occurred after the commencement of the action.

Accordingly, we conclude that the trial court had and retained jurisdiction.

■ Under the great weight of authority, the measure and elements of damage are matters pertaining to the substance of the right and not to the remedy and are to be determined by the place of the contract.[4]

■ Likewise, under the weight of authority, interest as damages is governed by the law of the place of the contract.[5]

Colorado has adopted the minority view as to interest as damages,[6] but we are not persuaded it would not follow the rule stated above as to damages generally.

■ The contract of sale was made and was to be performed in Kansas. We hold that the law of Kansas governs as to the measure and elements of damage.

The trial court applied the law of Colorado, but as we shall presently show, the result would not have been different had it applied the law of Kansas.

■ Where there is an unconditional contract for the sale of specific goods and such goods have been identified, selected and set aside separately to be supplied in performance of the contract, and nothing remains to be done, other than the delivery of the goods and the payment of the price, and a different intention does not appear, the property in the goods passes to the buyer without actual delivery or payment of the price.[7]

In the instant case, the contract was unconditional. Shortly after March 13, 1953, the seller selected and set aside 500 bags of specific sumac seed, in a deliverable condition, which conformed to the requirements of the contract, at its warehouse in Logan, Kansas, where, under the terms of the contract, it was to be received by the buyer. On April 7, 1953, it was mutually agreed between the seller and the buyer that the latter would pick up 250 bags of seed at Osborne, Kansas. In May, 1953, those 250 bags at Osborne, Kansas, were picked up and paid for by the buyer.

■ On April 7, 1953, the seller segregated 250 of the 500 bags of seed in its warehouse at Logan, Kansas, and set aside those specific bags, separate and apart, in a deliverable condition, and later advised the buyer that it had segregated and set them aside and held them for the buyer's account. We are of the opinion the title to the specific 250 bags at the warehouse in Logan passed at the time they were thus segregated and set apart, in deliverable condition, by the seller.

■ It follows that when the action was commenced the seller had the right to maintain an action for the balance of the purchase price. However, after a resale by the seller, it could not thereafter maintain an action for the balance

Southern Pacific Co. v. Haight, 9 Cir., 126 F.2d 900, certiorari denied 317 U.S. 676, 63 S.Ct. 154, 87 L.Ed. 542; Hood ex rel. North Carolina Bank & Trust Co. v. Bell, 4 Cir., 84 F.2d 136, 137.

4. Wynne v. McCarthy, 10 Cir., 97 F.2d 964, 970, certiorari denied 317 U.S. 640, 63 S.Ct. 31, 87 L.Ed. 515; Stentor Electric Mfg. Co. v. Klaxon Co., 3 Cir., 125 F.2d 820, 822, reversed on other grounds 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Restatement of the Law, Conflict of Laws, §§ 372, 413; 25 C.J.S., Damages, § 4a, pp. 462, 463.

5. 25 C.J.S., Damages, § 4b, p. 463; 17 C.J., Damages, § 143(e), p. 819.

6. Hays v. Arbuckle, 72 Colo. 328, 211 P. 101, 102; 25 C.J.S., Damages, § 4b, p. 463; 17 C.J., Damages, § 143(e), p. 820.

7. O'Farrel v. McClure, 5 Kan.App. 880, 47 P. 160, 161, 162; Winter v. Miller, 10 Cir., 183 F.2d 151, 153; Williston on Sales, Rev.Ed., Vol. 2, §§ 264, 343.

of the purchase price. Its remedy was an action for damages.[8]

■ If the time, place and method of resale were proper, the measure of damages was the difference between the balance of the contract price and the amount received at the resale.[9]

■ It was not necessary for the seller to give the buyer notice of the time and place of the resale.[10]

There is an important distinction with respect to the time a resale may be made, between cases where the contract is executory and cases where the property in the goods has passed to the buyer.[11]

Mr. Williston, in the revised edition of his work on sales, Vol. 3, § 550a, p. 175, says:

"There seems no reason, however, to impose a requirement of prompt sale on the seller where the sale is an executed one, though there may be a limit to a right to prolonged storage charges. But aside from such a claim the seller is entitled, by virtue of his lien, merely to hold the goods, and it may frequently be reasonable to hold them for a considerable time in the expectation of the buyer's ultimately taking them, and then after it clearly appears that the buyer will not take them, to resell them; * * *."

On June 1, 1953, Henrickson offered to sell the balance of the seed and stated he believed he could obtain $8 per cwt. The buyer refused to agree to such sale.

The buyer then promised Henrickson that it would thereafter advise him what it would do with respect to the balance of the seed. The buyer failed to give such advice to the seller. The seller retained possession of the seed, segregated and set apart, in its warehouse, for the buyer's account under the seller's lien. From time to time the seller tested the seed for germination quality. It continued to hold the seed thus set aside, separate and apart, in its warehouse, awaiting advice from the buyer, until about August 1, 1954, when tests showed that the germination quality of the seed had so fallen that it was no longer suitable for seed. The seller then sold the seed at a fair sale for the market price. The trial court so found.

The delay in the sale was entirely due to the fault and neglect of the buyer in refusing to permit the sale to be made in June, 1953, and to advise the seller with respect to the goods.

■ We are of the opinion that under the facts and circumstances presented on this record, the seller was justified in holding the seed, awaiting advice from the buyer, until the seed lost its germination qualities, rendering it unfit for seed, and that the sale was timely and properly made. The trial court must have so concluded, because it measured the damages on the basis of the unpaid purchase price, less the amount received by the seller for the seed at the resale.

The judgment is, therefore, affirmed.

8. Williston on Sales, Rev.Ed., Vol. 3, § 544, p. 166; Central Trust Co. v. Adams, 107 Kan. 126, 190 P. 755, 757; Id., 107 Kan. 492, 192 P. 761, 762, 763.

9. Central Trust Co. v. Adams, 107 Kan. 126, 190 P. 755, 757; International T. & R. Corp. v. Benscheidt, 141 Kan. 416, 41 P.2d 737; Williston on Sales, Rev.Ed., Vol. 3, § 546, p. 168.

10. Williston on Sales, Rev.Ed., Vol. 3, §§ 548, 549, pp. 171, 172.

11. Williston on Sales, Rev.Ed., Vol. 3, § 546, p. 168; § 550a, p. 175; Frederick v. American Sugar Refining Co., 4 Cir., 281 F. 305, 308, 309; Rosenbaum v. Weeden, 18 Grat., Va., 785. See also Urbansky v. Kutinsky, 86 Conn. 22, 84 A. 317.